UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | No. | 3:07-CR-98 |
| v. | ) | | (PHILLIPS/SHIRLEY) |
| | ) | | |
| ERNEST REAGAN, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate. This case came before the Court on October 4, 2007, for a hearing on

Defendant Reagan's Motion to Suppress. [Doc. 28] Assistant United States Attorney Brownlow

Marsh was present representing the government. Attorney Douglas Trant was present representing

Defendant Reagan, who was also present. At the conclusion of the hearing, the parties requested

leave to file post-hearing briefs. The government filed its brief [Doc. 33] on October 10, 2007, and

Defendant Reagan filed his brief [Doc. 34] on October 15, 2007. Defendant Reagan filed a

supplemental brief [Doc. 36] on October 29, 2007, citing newly published Sixth Circuit

jurisprudence. Defendant Reagan filed an additional supplemental brief [Doc. 40] on November 1,

2007, citing additional Tennessee jurisprudence. The matter is now ripe for adjudication.

Defendant Reagan ("Defendant") moves the Court to suppress all evidence obtained

by law enforcement officers subsequent to Defendant's arrest on July 10, 2007. Defendant contends

that law enforcement lacked probable cause to arrest, thus all evidence obtained should be

suppressed. The government opposes the motion, arguing that the arrest and subsequent search were

constitutionally valid.

## I.    SUMMARY OF TESTIMONY

### A.    <u>Testimony of Chad Faulkner</u>

During the hearing, the government called Chad Faulkner ("Officer Faulkner"), a deputy sheriff with the Knox County Sheriff's Office. Officer Faulkner testified that in the early morning of July 10, 2007, he was located at the Pilot gas station on Tazwell Pike in Knoxville, Tennessee. Officer Faulkner stated that he was sitting in his vehicle, an unmarked SUV, reading a newspaper, and that his SUV's windows were rolled up. Officer Faulkner indicated that at approximately 4:00 a.m., a black car (the "Vehicle") pulled in behind him, at which point he heard a disturbance. Officer Faulkner stated that he heard two people arguing, and then heard the passenger of the Vehicle shout to a customer "when can I buy some more beer?" Officer Faulkner testified that he believed he was observing a "disturbance or a domestic dispute."

Officer Faulkner indicated that the passenger then got out of the Vehicle and went into the Pilot store, at which point the driver of the Vehicle turned up the volume of the Vehicle's radio to a very loud level. Officer Faulkner testified that he was not in uniform, and that he had already removed his badge and weapon at that time, so he donned his badge, secured his weapon to his waist, and exited his SUV. Officer Faulkner stated that his SUV was approximately thirty feet away from the Vehicle. Officer Faulkner indicated that he then approached the Vehicle from the front and asked Defendant, who was driving the Vehicle, "what's the disturbance," to which Defendant responded "oh, there is no disturbance." Officer Faulkner testified that at that point he noticed two clear glasses of what he suspected was alcohol in the center console of the Vehicle and that he detected the odor of alcohol coming from the Vehicle. The government then asked Officer

Faulkner to look at a picture, which was later admitted into evidence as Government's Exhibit 3. Officer Faulkner indicated that the picture depicted the interior of the Vehicle, was taken that night, at the scene, and showed the glasses as Officer Faulkner observed them. Officer Faulkner again indicated that he smelled a strong odor of an alcoholic beverage.

Officer Faulkner stated that at that point he asked Defendant to step out of the Vehicle. Officer Faulkner testified that before Defendant exited the Vehicle, Officer Faulkner observed Defendant roll to his right and place his left hand in his left front pocket, remove a semi-automatic pistol, and place the gun in the Vehicle's driver's side door pocket. Officer Faulkner noted that Defendant was a big man, and that he, Officer Faulkner, did see the weapon. Officer Faulkner indicated that, after placing the gun in the door pocket, Defendant exited the vehicle, at which point Officer Faulkner handcuffed Defendant and patted him down for officer safety. Officer Faulkner stated that he felt his safety was in danger because of the presence of both alcohol and a gun, so he wanted to ensure that Defendant, and particularly his hands, was under control until Officer Faulkner investigated the situation. Officer Faulkner said that he and Defendant remained near the Vehicle. Officer Faulkner testified that he next Mirandized Defendant and asked him if there were any more weapons in the Vehicle, to which Defendant responded that there was a .38 caliber revolver in center console of the Vehicle.

Officer Faulkner testified that at that point he retrieved the pistol from the center console of the Vehicle and found that it was loaded. Officer Faulkner indicated that the smell of alcohol was coming from Defendant. Officer Faulkner stated that soon after that, the Vehicle's passenger, Ms. Russell, exited the Pilot store and got back in the Vehicle. Officer Faulkner said that Ms. Russell asked if she was free to go, at which point Officer Faulkner asked her to wait until

additional units arrived. Officer Faulkner testified that when the first patrol unit arrived on the scene, he placed Defendant in the back of the patrol unit.

On cross-examination, Officer Faulkner testified that he has been a Deputy Sheriff since November 6, 1995, but that he didn't attend the Sheriff's training academy until 1998. Officer Faulkner testified that he attended the corrections officer academy in 1997, but failed. Officer Faulkner was then asked to review a document.[1] Officer Faulkner stated that the document indicated that Officer Faulkner had told another officer that he believed the tests at the corrections officer academy would be common sense, so he didn't study for them. Officer Faulkner testified that he did not remember whether he actually said that or not. Officer Faulkner indicated that the document also indicated that one of the classes he failed was "confrontational management." Officer Faulkner testified that the document indicated that he should be expelled from the corrections officer academy, but Officer Faulkner also indicated that had never seen the document before and that he believed he was expelled from the class for physical reasons. Officer Faulkner stated that after failing the academy he returned to the position he had held before entering the academy, maintenance officer.

Officer Faulkner indicated that he had only related the one version of the events related to Defendant's arrest on July 10, 2007. Officer Faulkner agreed that he had taken out warrants on Defendant; had described the events to an FBI agent, who filed an affidavit based upon that information; had testified at the detention hearing in the instant case; had written a letter to one of his superior officers describing the incident; and that there was a tape taken from the video camera of the patrol officer's police cruiser depicting the events in question. Officer Faulkner

---

[1]The document was not entered into evidence.

confirmed that he put in the warrant that Defendant was screaming at the female, but at the hearing testified that the screaming was at a customer.

Officer Faulkner testified that when the Vehicle pulled up behind his SUV, he thought Defendant and Ms. Russell were arguing and having a domestic dispute, then Ms. Russell shouted at a Pilot customer, asking when she could buy beer, Ms. Russell left the Vehicle, and Defendant turned the radio up. Officer Faulkner testified that the drivers side window of Defendant's vehicle was rolled down when Officer Faulkner approached. Officer Faulkner testified that he could hear the radio from inside his truck and that he felt the noise was disturbing others. Officer Faulkner testified that he believed Defendant's radio was too loud, and that he believed that Defendant had violated state law. Officer Faulkner stated that he believed the state law did not specify a distance that the noise had to be audible from. Officer Faulkner testified that when he testified at the detention hearing he indicated that he felt that the noise was disturbing other people in the neighborhood, and that he meant that it was disturbing other customers in the parking lot of the Pilot store. Defense counsel next asked Officer Faulkner to review a copy of Tennessee Code Annotated § 55-8-193. Officer Faulkner read the statute and stated that the statute required that a car stereo must be audible from a distance of fifty feet to be in violation of state law, and that the Vehicle was only thirty to thirty-five feet away.

Officer Faulkner reiterated that he saw Defendant take a "black weapon" out of his pants pocket and place it in the Vehicle's door pocket after Officer Faulkner had approached the Vehicle and made contact with Defendant, not while Officer Faulkner was initially approaching the Vehicle. Officer Faulkner indicated that he was initially about thirty to thirty-five feet away from the Vehicle. Officer Faulkner testified that it was illegal for a driver to have an open container of

5

alcohol in a car, but agreed that he did not know who the glasses at issue in the instant case belonged to. Officer Faulkner stated that determining who the glasses belonged to was part of his investigation. Officer Faulkner indicated that he was unaware of any crime that had been committed at that point.

Officer Faulkner testified that he asked Defendant to get out of the Vehicle and then "detained" Defendant for officer safety. Officer Faulkner was asked to review the warrants he issued in relation to the events of July 10, 2007. The warrants were later admitted into evidence as Collective Defense Exhibit 1. After reviewing the documents, Officer Faulkner stated that the documents indicated that Defendant was "placed . . . into custody" after Defendant exited the Vehicle. Officer Faulkner stated that Defendant was "detained in custody." Officer Faulkner testified that he handcuffed Defendant, then patted Defendant down beside the Vehicle. Officer Faulkner indicated that the pat down recorded in the patrol officer's cruiser video was a second pat down for contraband, and that the first pat down was for officer safety.

Officer Faulkner testified that Defendant was under arrest when he patted down Defendant the second time in front of the patrol officer's car on the video, having been arrested on the felony weapon charge and public intoxication. Officer Faulkner indicated that because he was in an unmarked car, which did not have a video camera, he did not perform a field sobriety test, but instead would have the option of performing one at the detention center if he decided to pursue a DUI charge. Officer Faulkner stated that the patrol officer's car did have a video unit, but that unit wasn't his. Officer Faulkner testified that he did not have a blood test taken. Officer Faulkner further testified that Defendant was endangering society by being intoxicated while in the possession of two loaded firearms and operating a motor vehicle. Officer Faulkner testified that Defendant was

not operating a motor vehicle when Defendant exited the car, but that Defendant did drive up behind Officer Faulkner's SUV. Officer Faulkner stated that Defendant was not endangering anyone once Defendant was placed in handcuffs.

Officer Faulkner testified that he determined Defendant had a felony conviction by calling it in on his radio while Defendant was outside the patrol officer's police cruiser. Officer Faulkner agreed that he had stated at the detention hearing that he did not know whether Defendant had a handgun permit when Defendant exited his Vehicle. Officer Faulkner clarified that he further investigated and discovered Defendant had a felony conviction. Officer Faulkner stated that he placed Defendant into custody after Defendant exited the car, and it was after Defendant was placed in custody that Officer Faulkner discovered Defendant did not have a handgun permit and had previously been convicted of a felony. Officer Faulkner testified that Defendant was functioning and was able to walk and carry on a conversation, but that he could not recall whether Defendant was able to walk in a straight line, nor whether Defendant's speech was slurred.

Officer Faulkner was next asked to observe video footage taken from a police cruiser. Officer Faulkner indicated that the video footage revealed his white SUV and Defendant's black Vehicle. Officer Faulkner testified that the video accurately depicted the scene and that the female officer in the video was the patrol officer who first arrived at the scene. Officer Faulkner indicated that the video showed that Defendant was handcuffed and showed Officer Faulkner escorting Defendant to the police cruiser. Officer Faulkner agreed that the video showed Defendant walking to the cruiser while handcuffed without falling down or weaving.[2] Officer Faulkner stated that the

---

[2]Because of a technical malfunction, the initial portion of the audio component of the video could not be heard during the hearing, but a later *in camera* review of the complete video, which was admitted into evidence, revealed that Defendant's speech did not appear to be slurred.

female passenger depicted in the video is Ms. Russell. A DVD containing the video footage from the female patrol officer's in-cruiser video unit, the same footage displayed during the hearing, was admitted into evidence as Defendant's Exhibit 2.

The Court then asked Officer Faulkner to identify the vehicles depicted in the patrol officer's video footage. Officer Faulkner testified that the black Mercedes was Defendant's Vehicle, the white SUV was Officer Faulkner's vehicle, and that all of the vehicles depicted in the video were in the same positions they had been throughout the events in question. Officer Faulkner indicated that neither the SUV nor the Vehicle had been moved. Officer Faulkner was then excused.

**B.      Testimony of Steve Hinson**

Defendant then called Steve Hinson, legal assistant to Douglas Trant. Mr. Hinson indicated that he had been asked to prepare a summary chart summarizing the documents and exhibits related to the instant case. Mr. Hinson testified that the summary chart did accurately summarize the items in question. The summary chart was introduced as a demonstrative aid and marked as Defendant's Exhibit 4. A letter written by Officer Faulkner to his supervising Captain was introduced as Defendant's Exhibit 5. Mr. Hinson was then excused, at which point the Court took the matter under advisement pending the filing of post hearing briefs.

**II.      FINDINGS OF FACT**

The Court finds that during the early morning hours of July 10, 2007, Officer Faulkner was reading a newspaper in his unmarked, white SUV, which was parked at the Pilot gas station on Tazwell Pike. At approximately 4:00 a.m., Defendant, who was driving a black Mercedes, and Ms. Russell, who was sitting in the passenger seat, drove to the Pilot gas station on Tazwell Pike and pulled in behind Officer Faulkner. While sitting in his SUV, Officer Faulkner was

between thirty and thirty-five feet away from the Defendant's Vehicle. Officer Faulkner heard what he perceived to be an argument between Defendant and Ms. Russell, then heard Ms. Russell shout an inquiry to a passing customer, asking when she could purchase beer. Ms. Russell exited the Vehicle, entered the Pilot, and then Defendant turned up the volume on his radio.

At that point Officer Faulkner donned his badge, secured his weapon on his belt, and approached the Vehicle. Upon arriving at the Vehicle, whose driver's side window was rolled down, Officer Faulkner asked Defendant whether there was a disturbance, to which Defendant responded that there was no disturbance. Officer Faulkner then detected the odor of alcohol and observed two glasses containing what Officer Faulkner believed to be alcoholic beverages. Officer Faulkner then asked Defendant to exit the Vehicle.

Before exiting the Vehicle, Defendant rolled to his right, leaning slightly away from the driver's side window, placed his left hand in his left, front pants pocket, and removed a semi-automatic pistol, and then placed the semi-automatic pistol in the driver's side door pocket. Officer Faulkner observed the weapon and observed Defendant placing the semi-automatic pistol in the door pocket. Defendant then exited the Vehicle. After Defendant exited the Vehicle, Officer Faulkner handcuffed Defendant, Mirandized him, and asked Defendant whether there were any other weapons in the Vehicle. Defendant responded that there was another firearm in the center console of the Vehicle. After Defendant exited the Vehicle, Officer Faulkner was able to determine that Defendant smelled of alcohol. Faulkner then retrieved a loaded revolver from the center console of the Vehicle and a loaded semi-automatic pistol from the driver's side door pocket. Soon thereafter, Ms. Russell exited the Pilot, returned to the Vehicle, and asked if she could leave the scene. Officer Faulkner directed Ms. Russell to remain in the Vehicle until a patrol officer arrived on the scene.

A short time later, a female patrol officer arrived on the scene. The patrol officer's police cruiser was equipped with a video unit. The video from the patrol officer's video camera depicts Officer Faulkner's SUV, with Defendant's Vehicle parked between thirty and thirty-five feet behind the SUV. Officer Faulkner and Defendant, who was handcuffed, were standing next to the Vehicle when the patrol officer arrived. Shortly after the patrol officer's arrival, Officer Faulkner escorted Defendant to the front of the patrol officer's cruiser and searched Defendant for contraband. Officer Faulkner performed a record check on Defendant via Officer Faulkner's police radio and determined that Defendant was a previously convicted felon. Officer Faulkner then escorted Defendant around the patrol officer's police cruiser and placed Defendant in the back of the cruiser. Defendant did not stumble or otherwise have difficulty walking to the police cruiser, even though Defendant was handcuffed with his hands behind his back. Nor does the video indicate Defendant's speech was slurred at any time during the events in question. There is no dispute that Defendant was under arrest once he was placed in the cruiser, though Defendant does contend that he was effectively placed under arrest once he exited the Vehicle, so the Court need proceed no further with its findings of facts. Additional findings of fact follow, as appropriate.

### III.    POSITIONS OF THE PARTIES

Defendant contends that the Officer Faulkner lacked probable cause and did not have an articulable suspicion for approaching the Vehicle and for asking Defendant to exit the Vehicle. Defendant further argues that Officer Faulkner lacked probable cause for arresting Defendant. Defendant further contends that he did not formally waive his Miranda rights, thus any statement as to the existence of a second gun in the Vehicle should be suppressed. The government disagrees, arguing that Officer Faulkner was justified in approaching the Vehicle, was justified in asking

Defendant to exit the Vehicle, and that Defendant's arrest was constitutional.

## IV.    ANALYSIS

## A.    Officer Faulkner's Initial Approach

The first issue the Court must address is whether Officer Faulkner's initial approach of Defendant was constitutional. The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend. IV. However, the Sixth Circuit has identified three types of permissible encounters between the police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." United States v. Waldon, 206 F.3d 597, 602 (6th Cir. 2000) (quoting United States v. Avery, 137 F.3d 343, 352 (6th Cir. 1997)). In a consensual encounter, "law enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." Id., 206 F.3d at 603. Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity. Id. In other words, even if the officer suspects the citizen of wrongdoing, he may still engage in a consensual encounter with that citizen. Id.

In the instant case, Officer Faulkner's initial approach constituted a consensual encounter. Officer Faulkner was free to walk up to Defendant's Vehicle and ask Defendant general questions, whether the officer had a reasonable suspicion of criminal activity or not. Thus, the Court finds that Officer Faulkner's initial approach of Defendant was constitutional.

**B.**     **Investigative Detention**

Having determined that Officer Faulkner's initial approach of Defendant was constitutional, the Court must continue its analysis. As the Court noted above, during a consensual encounter an officer is limited to general questions and may not display "the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." Id. Should the encounter proceed beyond the consensual stage, the Court must determine whether the officer satisfied the requirements of one of the remaining permissible types of encounters: instigative detention or arrest. Should a consensual encounter rise to the level of an investigative detention, the officer is obliged to employ "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." United State v. Lopez-Arias, 344 F.3d 623, 627 (6th Cir. 2003) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). The scope of the permissible intrusion is limited by the circumstances that initially justified the stop. Id. Otherwise, the seizure could become an arrest which must be supported not just by reasonable suspicion, but by probable cause. There is, however, no bright line standard for determining when an investigative detention becomes an arrest. Id.

Thus, in evaluating the constitutionality of an investigative detention, the Court engages in a two-part analysis of the reasonableness of the stop. United States v. Davis, 430 F.3d 545, 554 (6th Cir. 2005). The Court first asks whether there was a proper basis for the stop, which is judged by examining whether the law enforcement official was aware of specific and articulable facts which gave rise to reasonable suspicion. Id. If the stop was proper, then the Court must determine whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the official's conduct given his suspicions and

the surrounding circumstances.  Id.

After approaching the Vehicle and asking a general question (the nature of the disturbance), Officer Faulkner detected the odor of alcohol and observed in the Vehicle two glasses of what appeared to be some type of alcoholic beverage.  Tennessee law prohibits a driver from possessing an open container of alcohol while operating a vehicle.  Tenn. Code Ann. § 55-10-416. Given that Officer Faulkner observed Defendant drive into the parking lot, and given that there were only two individuals in the Vehicle, the Court finds that Officer Faulkner could draw a reasonable inference that Defendant may have been in possession of one of the two glasses while operating the Vehicle.  The Court further finds that Officer Faulkner thus had a reasonable, articulable suspicion, supported by facts and a rational inference, that Defendant may have been engaged in criminal activity, namely violation of Tennessee's open container law.  See United States v. Cortez, 449 U.S. 411, 419 (1981) (holding that reasonable suspicion may be based upon a combination of objective facts and permissible inferences drawn from those facts).

Accordingly, the Court finds that, under the totality of the circumstances, Officer Faulkner was entitled to escalate the encounter to the level of an investigative detention.  Terry, 391 U.S. at 21.  The Court further finds that it was not unreasonable for Officer Faulkner to ask Defendant to exit the vehicle so that Officer Faulkner could verify or dispel his suspicions in a short period of time.  See Maryland v. Wilson, 519 U.S. 408, 412 (1997) (quoting Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) (holding that once validly stopped, "police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures.")  Thus, Officer Faulkner did not impermissibly exceed the scope of the investigative detention by asking Defendant to exit the vehicle.

**C.**   **Pat Down**

Next, the Court examines the propriety of Officer Faulkner's hand-cuffing and patting down Defendant. The Supreme Court has held, that during an investigative detention, or <u>Terry</u> stop, it is permissible for an officer to perform "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." <u>Terry</u>, 392 U.S. at 27. In subsequent cases, the Supreme Court extended the constitutionality of the <u>Terry</u> pat-down frisk of the individual to apply to a <u>Terry</u> pat-down search of the vehicle. <u>See</u> <u>New York v. Belton</u>, 453 U.S. 454, 460 (1981) (holding that "articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon.'"); <u>Chimel v. California</u>, 395 U.S. 752 (1969) (in relying explicitly on <u>Terry</u>, holding that when an arrest is made, it is reasonable for the arresting officer to search "the arrestee's person and the area 'within his immediate control', meaning the area from within which he might gain possession of a weapon.").

Additionally, the Sixth Circuit has held that a handgun is among those "objects dangerous in themselves" which may be seized without a warrant, and that such a seizure is justified by a legitimate concern for police safety. <u>See</u> <u>United States v. Bishop</u>, 338 F.3d 623, 626 (6th Cir. 2003). Furthermore, the Court notes that while it is true that <u>Miranda</u> warnings are required when "a suspect's freedom of action is curtailed to a 'degree associated with a formal arrest,'" <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)(per curiam)), the mere reading of <u>Miranda</u> warnings does not convert a noncustodial interview into a custodial interrogation, <u>United States v. Lewis</u>, 556 F.2d 446, 449 (6th Cir. 1977)

(per curiam) ("The precaution of giving <u>Miranda</u> rights in what is thought could be a non-custodial interview should not be deterred by interpreting the giving of such rights as a restraint on the suspect, converting a non-custodial interview into a custodial interrogation for <u>Miranda</u> purposes."). Finally, the Court notes that, "[i]n conducting a <u>Terry</u> stop, police officers may draw their weapons and use handcuffs without offending the Fourth Amendment if they reasonably believe that a suspect is armed and might pose a danger to them as they conduct their investigation." <u>Campbell v. Stamper</u>, No. 06-6198, 2007 U.S. App. LEXIS 16516, at *11 (6th Cir. July 2, 2007).

        In the instant case, Officer Faulkner observed Defendant pull a gun from Defendant's pocket and place it in the Vehicle's door pocket. The Court finds that once Officer Faulkner observed the gun, it was reasonable for the officer to assume that defendant might be dangerous and to conclude that a <u>Terry</u> pat down was necessary. The Court notes that Officer Faulkner appeared to use the terms "detained" and "in custody" interchangeably. In the letter to his superior, Officer Faulkner indicated that Defendant was "detained" when Defendant exited the Vehicle. [Defendant's Exhibit 5] In the state warrants related to the events of July 10, 2007, Officer Faulkner indicated that Defendant was "placed . . . into custody" after exiting the Vehicle. [Defendant's Collective Exhibit 1] Additionally, during the hearing, Officer Faulkner referred to Defendant as "detained in custody." However, other courts have recognized that law enforcement officers are often "unfamiliar with . . . 'legal terms of art'" <u>Jean v. Collins</u>, 221 F.3d 656, 668 (4th Cir. 2000), and, after observing Officer Faulkner's demeanor during the hearing, the Court does not find the officer's confusion to be indicative of some attempt to conceal an untimely arrest. Thus, despite Officer Faulkner's confusion in word choice, the Court finds that the initial handcuffing and Mirandizing of Defendant did not escalate the encounter to the level of an arrest. <u>Berkemer</u>, 468 U.S. at 440;

<u>Campbell</u>, 2007 U.S. App. LEXIS 16516, at *11.[3]

      Defendant also argues that Officer Faulkner erred by failing to obtain a waiver from Defendant before asking him whether there were any other weapons in the Vehicle. However, as the Court noted above, Defendant was not under arrest, and thus Officer Faulkner was not required to obtain a waiver of Defendant's <u>Miranda</u> rights before questioning Defendant in relation to the stop. <u>See</u> <u>Berkemer</u>, 468 U.S. at 440 (holding that neither <u>Terry</u> stops, nor traffic stops, are subject to the dictates of <u>Miranda</u>). Additionally, the Sixth Circuit has held that "[a]lthough [the defendant] suggests that his waiver was not knowingly, voluntarily and intelligently made because he did not sign a waiver form listing his rights, he offers no authority, and none can be found, for the proposition that a written waiver is necessary to establish a knowing, intelligent and voluntary waiver of Miranda rights." <u>United States v. Miggins</u>, 302 F.3d 384, 397 (6th Cir. 2002). Accordingly, the Court finds that Defendant's constitutional rights were not violated when Officer Faulkner handcuffed Defendant, performed a <u>Terry</u> pat down of Defendant, and asked Defendant if there were any other weapons in the Vehicle. The Court further finds that it was permissible for Officer Faulkner to seize the weapons at issue in this case. <u>Bishop</u>, 338 F.3d at 626.

**D.**    <u>**Arrest**</u>

      Finally, the Court must determine when Defendant was effectively placed under arrest and whether Defendant's arrest was constitutional. An arrest is valid only if supported by probable cause. <u>Waldon</u>, 206 F.3d at 602. Probable cause exists when the arrest officer possess

---

[3]As in <u>Berkemer</u>, Defendant was effectively seized under the Fourth Amendment, but the encounter with Officer Faulkner was equivalent to a traffic stop, in "public view," not a prolonged police interrogation normally associated with <u>Miranda</u>. <u>Berkemer</u>, 468 U.S. at 438-40.

reasonably trustworthy knowledge that the suspect is committing or has committed a crime. <u>United States v. Dotson</u>, 49 F.3d 227, 230 (6th Cir. 1995).

In the instant case, after observing that Defendant was in possession of two guns, Officer Faulkner used his radio to perform a records check on Defendant and determined that Defendant was a convicted felon.[4]  It is illegal for a convicted felon to possess a firearm.  18 U.S.C. § 922(g)(1).  Thus, once Officer Faulkner located the firearms and determined that Defendant was a convicted felon, Officer Faulkner had probable cause to arrest Defendant for being a felon in possession of a firearm.  However, there remains some question as to when Officer Faulkner determined that Defendant was a convicted felon.

The Court notes that Officer Faulkner testified that Defendant was under arrest when Defendant was patted down for a second time in front of the patrol officer's cruiser, and that Defendant was arrested on the felony weapon charge and public intoxication.[5]  Officer Faulkner also testified that he determined that Defendant had a felony conviction by calling it on his police radio while Defendant was outside the patrol officer's cruiser. Thus, both the arrest of Defendant and the determination that Defendant had previously been convicted of a felony occurred while Officer Faulkner and Defendant were standing outside the patrol officer's cruiser, but the Court is unable to determine whether Officer Faulkner arrested defendant before, contemporaneous with, or after learning that defendant had previously been convicted of a felony.

---

[4]  The Court also finds that such a check was permissible under the confines of the investigative stop, as the officer was taking the most reasonable and least invasive step necessary to quickly determine whether Defendant had committed a crime.

[5]The Court addresses below whether there was probable cause to arrest Defendant for public intoxication.

Yet, this lack of evidence, while preventing the Court from determining whether Officer Faulkner had probable cause precisely at or before the time of the arrest to believe that Defendant was a felon in possession of a firearm, does not automatically result in a finding that the arrest was unconstitutional and that any evidence obtained must be suppressed. Rather, the Court must determine whether that was some other permissible basis for the arrest.

The Sixth Circuit has held that "knowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed by the defendants." United States v. Anderson, 923 F.2d 450, 457 (6th Cir. 1991). The Anderson court further held that "probable cause is determined by an objective examination of all of the circumstances known to the officers. Just as a subjective belief by the arresting officer would not establish probable cause where none existed, a subjective belief by the arresting officer cannot destroy probable cause where it exists." Id.

In the instant case, Officer Faulkner testified that he arrested Defendant on the felony weapon charge and public intoxication. Tennessee law establishes, in pertinent part, the following with respect to possession of firearms:

> (a) (1) A person commits an offense who carries with the intent to go armed a firearm, a knife with a blade length exceeding four inches (4"), or a club.
>
> (2) (A) The first violation of subdivision (a)(1) is a Class C misdemeanor, and, in addition to possible imprisonment as provided by law, may be punished by a fine not to exceed five hundred dollars ($500).
>
> (B) A second or subsequent violation of subdivision (a)(1) is a Class B misdemeanor.
>
> (C) A violation of subdivision (a)(1) is a Class A misdemeanor if the person's carrying of a handgun occurred at a place open to the public

where one (1) or more persons were present.

(b)  (1) A person commits an offense who possesses a handgun and:

(A) Has been convicted of a felony involving the use or attempted use of force, violence or a deadly weapon; or

(B) Has been convicted of a felony drug offense.

(2) An offense under subdivision (b)(1) is a Class E felony.

Tenn. Code Ann. § 39-17-1307.  Thus, under Tennessee law, it is a misdemeanor for an individual to carry a firearm with the intent to go armed, but, under the same statute, a felony for an individual convicted of certain felonies to posses a firearm.  Id.  Tennessee law further provides that possession of a firearm carry permit, pursuant to Tennessee Code Annotated § 39-17-1351, is a defense to the application of Tennessee Code Annotated § 39-17-1307.  Tenn. Code Ann. § 39-17-1308.

With respect to the firearm charge, Officer Faulkner testified that he had arrested defendant on a felony weapon charge.  Thus, there is no evidence before the Court that Officer Faulkner considered the lesser, misdemeanor offense of carrying a weapon with intent to go armed as a basis for Defendant's arrest.  Yet, while Officer Faulkner may not have considered a violation of Tennessee Code Annotated § 39-17-1307(a)(1) as a basis for the arrest, the Court finds that there was probable cause to believe that Defendant was in violation of that portion of the statute. Specifically, given that Officer Faulkner observed Defendant remove a loaded firearm from Defendant's pants pocket and also determined that Defendant was carrying a second loaded firearm from the Vehicle's center console, there was probable cause to believe that Defendant was carrying a firearm with intent to go armed.

Additionally, while Defendant argues that Officer Faulkner could not know if Defendant was in violation of the law because Officer Faulkner did not know whether Defendant

possessed a firearm carry permit, the Court is not persuaded by Defendant's argument. As the Court noted above, having a carry permit is a defense to the crime of carrying a firearm with the intent to go armed, thus the burden fell upon Defendant to establish that he actually had such a valid carry permit and that such information was communicated to Officer Faulkner. In this case, Defendant failed to establish either fact, and thus failed to meet his burden. Accordingly, the Court finds that there was probable cause to believe that Defendant was in violation of the misdemeanor offense defined in Tennessee Code Annotated § 39-17-1307(a)(1).

Additionally, the Court finds that once Officer Faulkner observed the two firearms, probable cause to arrest for a violation of Tennessee Code Annotated § 39-17-1307(a)(1) existed. Given the fact that there was probable cause to arrest, under Anderson, it is immaterial that Officer Faulkner was relying on a different basis (or a different section of the same statute) for the arrest. The Court further finds that at some point, prior to, at, or very near the time of the arrest, Officer Faulkner determined that Defendant had previously been convicted of a felony. Once that determination was made, there was probable cause to believe Defendant had violated not only the other section of the statute, but also federal law by being a previously convicted felon in possession of a firearm. 18 U.S.C. § 922(g)(1). Thus, the Court finds that Officer Faulkner's arrest of Defendant was constitutional.

E. **Invalid Bases for Arrest**

While the Court does find that Officer Faulkner had probable cause to arrest Defendant for violation of Tennessee Code Annotated § 39-17-1307(a)(1)[6], the Court continues with

---

[6]And for violation of Tennessee Code Annotated § 39-17-1307(b), if the arrest occurred after Officer Faulkner was advised of Defendant's prior felony conviction.

its probable cause analysis to determine whether there was probable cause to arrest Defendant for any other violations. The government argues that Defendant also violated Tennessee's public intoxication statute, codified at Tennessee Code Annotated § 39-17-310. That statute provides that:

> A person commits the offense of public intoxication who appears in a public place under the influence of a controlled substance or any other intoxicating substance to the degree that: (1) The offender may be endangered; (2) There is endangerment to other persons or property; or (3) The offender unreasonably annoys people in the vicinity.

Id. The Court also notes that a place of business, specifically the Pilot gas station, does qualify as a "public place." Tenn. Code Ann. § 39-11-106(a)(29).

Officer Faulkner testified that he did not did not perform a field sobriety test on Defendant, nor did he perform a blood test or any other test for determining the level of Defendant's intoxication. Additionally, as the Court noted above, the video footage in evidence indicates that Defendant's speech was not slurred and that Defendant had no visible difficulty walking, even though his hands were handcuffed behind his back. Thus, the only evidence of Defendant's level of intoxication is the odor of alcohol Officer Faulkner detected on Defendant.[7]

Without some evidence as to Defendant's level of intoxication, the Court cannot find that there was probable cause to believe that Defendant presented a danger to himself or a danger to others. Officer Faulkner testified that he felt that Defendant presented a danger to society because of the combination of alcohol, weapons, and a motor vehicle, but the public intoxication statute

---

[7]The Court notes that the presence of two glasses of what might have been alcoholic beverages is not helpful to the probable cause analysis, because there is no evidence of whether the glasses actually contained alcohol, only that they might have contained alcohol. Thus, the Court finds that the glasses, while sufficient to provide reasonable suspicion, are insufficient to support a finding of probable cause.

requires that the danger be caused by the defendant's intoxication, and there is simply no evidence indicating Defendant was sufficiently intoxicated. Nor is there evidence that Defendant actually annoyed people in the vicinity. Officer Faulkner testified that he believed Defendant's loud stereo was annoying people, but, as the Tennessee Court of Criminal Appeals has noted, "[t]hat someone in the area could have heard the defendant does not establish that he unreasonably annoyed others. The statute requires that the defendant, in fact, 'unreasonably annoy[] people in the vicinity,' not that his conduct could have annoyed others." Tennessee v. Wilson, 990 S.W.2d 726, 729 (Tenn. Crim. App. 1998). Nor is there any evidence that Ms. Russell was endangered or annoyed by the potential domestic dispute Officer Faulkner believed he had heard. Thus, the Court finds that Officer Faulkner lacked probable cause to support an arrest for public intoxication.

The government also argues that Defendant could have been arrested for disorderly conduct. Tennessee law defines disorderly conduct as:

> (a) A person commits an offense who, in a public place and with intent to cause public annoyance or alarm:
>
> (1) Engages in fighting or in violent or threatening behavior;
>
> (2) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard or other emergency; or
>
> (3) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.
>
> (b) A person also violates this section who makes unreasonable noise that prevents others from carrying on lawful activities.

Tenn. Code Ann. § 39-17-305. As the Court noted above, the Pilot gas station does qualify as a public place. However, the Court cannot find that there was probable cause believe that Defendant was engaged in fighting or in violent or threatening behavior, nor that Defendant refused to obey

an official order to disperse, nor that Defendant created a hazardous or physically offensive condition. And while Defendant's stereo may have been producing an unreasonable noise, there is no evidence that the noise prevented others from carrying on lawful activities. Accordingly, the Court finds that Officer Faulkner lacked the requisite probable cause to arrest Defendant for disorderly conduct.

The government also argues that Officer Faulkner could have arrested Defendant for violation of the open container law. However, Tennessee's open container law uniquely provides that in the event of a violation of the open container law, the "law enforcement officer **shall** issue a citation in lieu of continued custody, unless the offender refuses to sign and accept the citation, as provided in § 40-7-118." Tenn. Code Ann. § 55-10-416 (emphasis added). Thus, even if Officer Faulkner had probable cause to believe Defendant had violated the state open container law, such a violation, standing alone, would be insufficient grounds to arrest Defendant, unless Defendant refused to sign and accept the citation. There is no evidence that such a citation was issued, so, in the absence of some other offense for which arrest would be appropriate, a violation of Tennessee's open container law alone would be insufficient to support the arrest of Defendant.

Finally, the government also argues that Officer Faulkner could have arrested Defendant for excessive noise from defendant's Vehicle. However, as Officer Faulkner stated at the hearing, Tennessee law requires that the noise coming from a motor vehicle must be audible at a distance of fifty feet or more. Tenn. Code Ann. § 55-8-193. Officer Faulkner testified that he was, at most, thirty-five feet away from Defendant's Vehicle, thus there was no proof or evidence that established whether Defendant's car stereo was actually audible at a distance of fifty feet or more. Accordingly, the Court finds that Officer Faulkner lacked the requisite probable cause to arrest

Defendant for excessive noise from a motor vehicle. Thus, the Court finds that the only permissible basis for Defendant's arrest was a charge carrying a firearm with the intent to go armed and/or of being a felon in possession of a firearm.

**F.     Subsequent Search of Vehicle**

After Defendant was placed under arrest, the officers proceeded to further search Defendant's vehicle. However, the United States Supreme Court has held that when a police officer has made a lawful custodial arrest of an occupant of an automobile, the Fourth Amendment allows the officer to search the passenger compartment of that vehicle as a contemporaneous incident of arrest. New York v. Belton, 453 U.S. 454 (1981). Given that the Court has found that Defendant was permissibly arrested for a violation of Tennessee Code Annotated § 39-17-1307(a)(1), the Court further finds that Defendant's constitutional rights were not violated when the officers searched the Vehicle incident to Defendant's arrest. Once probable cause to arrest, as here, has been established, the search incident to that arrest may be for both weapons and evidence. United States v. Hughes, 898 F.2d 63, 64 (6th Cir. 1990).

Additionally, as the Court noted above, the United States Supreme Court has recognized that during a Terry stop it is permissible for an officer to make a more limited search of the passenger compartment of a vehicle, i.e., only for weapons. Thus it was permissible for Officer Faulkner to initially seize the two firearms (that he observed and was advised of) before placing Defendant under arrest. See New York v. Belton, 453 U.S. 454, 460 (1981) (holding that "articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon.'"); Chimel v. California, 395 U.S. 752 (1969) (in relying explicitly on Terry, holding that

when an arrest is made, it is reasonable for the arresting officer to search "the arrestee's person and the area 'within his immediate control', meaning the area from within which he might gain possession of a weapon."). Furthermore, the Court finds that Defendant's possession of a loaded weapon on his person, and the presence of a second loaded weapon in the center console of the Vehicle, constitutes more than reasonable belief that the suspect was potentially dangerous, and permited the search of the Vehicle for other weapons without a warrant or without a showing of probable cause.

## G.     Supplemental Briefs

In his first supplemental brief [Doc. 36], Defendant argues that there is no automatic companion rule in Tennessee, thus it would be improper to consider the actions of Defendant's "companion," Ms. Russell, in analyzing the constitutionality of Defendant's encounter with Officer Faulkner. Given that the Court's analysis does not rely on the actions, or even the presence, of Ms. Russell, the Court need not address Defendant's arguments in his first supplemental brief.

In his second supplemental brief [Doc. 40], Defendant cites to the case of <u>Tennessee v. Wilson</u>, 990 S.W.2d 726 (Tenn. Crim. App. 1998). The Court discusses <u>Wilson</u> in its analysis above, so the Court need not further address Defendant's second supplemental brief.

### III.      Conclusion

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Defendant Ernest Reagan's Motion to Suppress [Doc. 38] should be **DENIED**.[8]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[8] Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).